FILED

10/20/2022

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 12, 2022

**STATE OF TENNESSEE v. TYLER KEITH PARRISH**

**Appeal from the Circuit Court for Marshall County**
**No. 2020-CR-95    M. Wyatt Burk, Judge**

_____

**No. M2021-01452-CCA-R3-CD**

_____

Tyler Keith Parrish, Defendant, was convicted by a jury of two counts of aggravated sexual battery. The trial court affirmed the jury verdict, merged the two convictions, and sentenced Defendant to a within-range sentence of 12 years as a Range I, standard offender. On appeal, Defendant challenges the sufficiency of the evidence and his sentence as excessive. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and JILL BARTEE AYERS, JJ., joined.

Donna Hargrove, District Public Defender; William J. Harold (at trial and on appeal) and Michael Collins (at trial), Assistant District Public Defenders, Lewisburg, Tennessee, for the appellant, Tyler Keith Parrish.

Herbert H. Slatery III, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Robert J. Carter, District Attorney General; and William Bottoms and Lee Brooks, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

In July of 2020, Defendant was indicted for two counts of aggravated sexual battery for events that took place in June of 2020 involving his young daughter.[1] At trial, the

---

[1] It is the policy of this Court to protect the privacy of victims of sexual offenses.

following evidence was introduced: The victim testified that she was born on Christmas and that at the time of the incident she was 10 years old. Defendant is victim's father. The victim has four brothers and one sister and is the second oldest of the children. Four of the children were staying at Defendant's house in June of 2020.

One night at around 11 p.m., as the victim was trying to fall asleep, she was listening to music on her tablet in her "dad's bedroom." The victim was wearing "[a] Lion King shirt and blue sweatpants[,]" which she described as loose-fitting. One of her little brothers was in the bed with her. Eventually, she fell asleep. She awoke around 2:00 or 3:00 a.m. "to someone reaching for [her] chest." She realized that her younger brother was no longer in the bed and that Defendant was in the bed with her, "reaching" for her "left side." Defendant's "face was in his pillow" and the victim did not know if Defendant was awake or asleep. Defendant's hand was "on the inside" of her shirt. The victim "froze and acted asleep." After about what seemed like "5 to 10 minutes[,]" Defendant "moved [his hand] around" the victim's stomach. Defendant kept his hand on her stomach for what seemed like about 10 to 15 minutes, and then he moved his hand into her sweatpants and put his hand on her private parts "[w]here [she] pee[s]." Defendant's hand was not moving around. The victim was shocked. Defendant eventually took his hand out of her pants and "tried to put his arm around [her] stomach again." Defendant was still face down on the pillow. The victim got up and ran to the bathroom and "started to cry." When she regained composure, she went to the room where her brothers were sleeping to see if anyone was awake. One of her brothers was awake, but she did not tell him about what happened. She went back to Defendant's room, grabbed her tablet, and went back to her room where she watched YouTube videos and listened to music until she fell asleep. Defendant had not moved from the pillow when the victim retrieved her tablet.

The next day, the victim went to her best friend's house. She returned to Defendant's house that evening. When Defendant was making dinner, the victim retrieved her tablet from the charger and called her mother to tell her what happened.

The victim's mother was once married to Defendant. Their marriage ended in 2015. The victim's mother recalled that the visit was not part of structured parenting time but that several of the children were staying at Defendant's home in Chapel Hill. The children had been there for about a "week and a half." On June 10, 2020, the victim "video-chatted" with her mother on Instagram using her tablet at Defendant's house. She appeared "[f]rightened, nervous" and told her mother about what happened to her in her father's bedroom. The victim's mother initially asked if the victim was "just trying to come home." As a result of the conversation, the victim's mother "got in [her] car from [her] house and started to head to Chapel Hill while making phone calls" to the Marshall County Sheriff's Office and the Chapel Hill Police Department. As instructed by police, she stopped at the Chapel Hill Police Department on the way and eventually got to Defendant's house about

an "hour and a half to two hours" after she first heard from the victim. The victim's mother was "[e]nraged, confused" and "held back" by her stop at the police department.

Once she arrived at Defendant's house, the victim's mother picked up all four children. She talked to Defendant, who admitted that he was drinking and using marijuana on the night of the incident. He "couldn't recall" any of the events that the victim described to her mother but recalled going to the room and seeing the victim in bed. When the victim's mother and children left Defendant's house, they returned to the police department.

Heather Warden of the Junior House Child Advocacy Center, an expert witness in the area of forensic interviewing of children, interviewed the victim on June 12. The interview was observed by Chief Andrew Kon from the Chapel Hill Police Department and Child Protective Services Investigator John Miller as well as recorded by both audio and visual equipment.

Chief Kon of the Chapel Hill Police Department spoke with the victim's mother when she called the police department to report the abuse. He described her as "hysterical" and asked her to come to talk to the police in person. After talking with the victim's mother, Chief Kon contacted "DCS" to determine "whether or not [they] needed to have the child removed." The victim's mother went to pick up her children from Defendant's house. The police began their investigation by setting a forensic interview for the victim the following day.

Defendant was transported to the police department, "Mirandized", and questioned by Chief Kon and a sergeant. During the interview, Defendant asked for an attorney. The interview was terminated at that time.

The victim's forensic interview was introduced as an exhibit at trial and played for the jury. During the interview, the victim described the incident consistently with her trial testimony. The victim told Ms. Warden that she fell asleep in Defendant's bedroom in Chapel Hill and woke up and felt someone touching her chest on her left side under her shirt on her skin. She realized it was Defendant. She was scared, and she stayed very still. Next, Defendant touched her "private part" by putting his hand on her body inside her underwear, leaving it there for a few minutes. Defendant next touched her side. The victim was wearing sweatpants and a t-shirt at the time. The victim told Ms. Warden that she eventually got up and went to the bathroom. After she went to the bathroom the victim walked back into the bedroom to retrieve her tablet. The victim did not notice anything change about Defendant's body when he touched her. The victim remembered talking to Ms. Warden on another occasion about a similar incident involving another person.

Defendant chose not to testify at trial. After closing arguments and jury instructions, the jury retired to deliberate. The jury found Defendant guilty of both counts of aggravated sexual battery, as charged in the indictment.

The trial court held a separate sentencing hearing. At the hearing, the parties agreed that Defendant was a Range I offender for the two Class B felony convictions for aggravated sexual battery, meaning that Defendant was subject to a range of 8 to 12 years in incarceration to be served at 100%, pursuant to Tennessee Code Annotated section 40-35-501.

At the sentencing hearing, the State argued that enhancement factors (1), (8), and "possibly" (13) applied and also asked the trial court to consider applying factors (4) and (7). Defendant disagreed, arguing that none of the enhancement factors applied and that mitigating factors (1) and (13) would place Defendant at the lower end of the sentencing range.

The State noted that the presentence report included Defendant's criminal history of 13 total convictions, including one felony conviction for arson as well as several probation violations.

The victim testified that she had spent over a year "asking God why He did this to [her]" before she realized that it was Defendant who did this to her. The victim's mother testified that the events that took place brought her to a "breaking point." The victim's mother testified that there were previous allegations that Defendant did something sexual to one of their other children but that the allegations did not result in any charges. The victim's mother implored Defendant to "get help." The victim's mother acknowledged that Defendant was "the victim of [molestation] when he was younger."

Defendant's mother, Karen M. Couch, testified that Defendant was 34 years old at the time of the sentencing hearing. During Defendant's incarceration for an arson conviction, he was diagnosed as schizophrenic and bipolar. Defendant also suffered from "high anxiety and PTSD" from "an occurrence when he was a teenager where he was assaulted." Defendant's mother explained Defendant's father "died when he was 12 and [Defendant] started getting into drugs [around age 10] and getting into trouble at school, having panic attacks." She sent him to a "special program" called Three Springs in Centerville for five and a half months. Defendant completed that program and did well for some time before he "went off the deep end" with drugs. Defendant spent two and a half years at a program in Montana for troubled teens called Spring Creek Academy. Defendant continued in this program until he was 19. Although he did "well" in that program, the victim's mother explained that he "always struggled." She described Defendant as "well-

liked" and "fiercely loyal." Defendant's mother did not "believe that he would do anything intentionally if he was in his right frame of mind."

After hearing argument, the trial court noted that Defendant was convicted of two Class B felonies as a Range I offender, so the possible sentence was 8 to 12 years at 100%. The trial court applied enhancement factor (1) based on Defendant's previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, giving it "tremendous weight." The trial court pointed to Defendant's 12 prior misdemeanor convictions and one prior felony arson conviction. The trial court also applied enhancement factor (8), finding that Defendant had failed to comply with the conditions of a sentence involving release into the community. The trial court commented on Defendant's "multiple" probation violations as evidenced by two exhibits introduced at the sentencing hearing. The trial court also gave factor (8) "tremendous weight." The trial court declined to apply enhancement factor (4), that the victim was particularly vulnerable due to age or physical or mental disability because age was an element of the offense and the facts did not show the victim was otherwise vulnerable. Similarly, the trial court declined to apply enhancement factor (7), that the offense was committed to gratify Defendant's desire for pleasure or excitement, because the "touching for gratification is an essential element of the offense." The trial court declined "out of an abundance of caution" to apply enhancement factor (14), that Defendant abused a position of trust but noted that any young person should be able to trust their dad.

As to mitigating factors, the trial court "understands the argument with respect to [mitigating factor (1),] that [Defendant's] criminal conduct neither caused or threatened serious bodily injury[,]" but recalled both the victim and the victim's mother becoming very emotional during the trial. The trial court found that the emotional harm brought on by Defendant's actions would "take time" to heal but that there was no "serious bodily injury." As a result, the trial court found that mitigating factor (1) applied but gave it "no weight." The trial court applied the catch-all mitigating factor (13), taking into account Defendant's "challenges he had growing up" with mental illness but gave it "very little weight, if any at all."

The trial court ordered Defendant to serve a sentence of 12 years for each conviction but determined that the conduct constituted a "single continuous event" and ordered Count 1 to merge with Count 2. The trial court noted that Defendant was not eligible for probation, but even if he were eligible, Defendant was not a candidate based on his prior criminal history, likelihood to re-offend, and failure to comply with probation in the past. The trial court noted that Defendant was required to be sentenced to community supervision for life in addition to his sentence of incarceration. The trial court found that the sentence was reasonably related to the severity of the offense and necessary to accomplish the ends of justice. The trial court specifically found that in fashioning the

sentence, the trial court considered the evidence, the presentence report, the principles of sentencing and arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, the mitigating and enhancement factors, statistical information regarding sentencing, the witnesses, Defendant's potential for rehabilitation, and Tennessee Code Annotated section 40-35-103.

Defendant filed a timely motion for new trial in which he argued that the evidence was insufficient to support the convictions and that his sentence was excessive. The trial court denied the motion after a hearing, and Defendant appealed to this Court.

*Analysis*

*Sufficiency of the Evidence*

On appeal, Defendant argues that no rational trier of fact could have found all the elements of aggravated sexual battery because Defendant "did not engage in conduct that would lead a rational trier of fact to believe that he committed the offense[s] for which he was convicted." Specifically, Defendant points to the testimony by the victim that Defendant appeared to be asleep and that "the only person to testify about what happened that night" was the victim. Defendant insists that because he was asleep, he "could not form the intent to commit the act" and that there was "no sexual arousal or gratification." The State disagrees, noting that Defendant is essentially asking this Court to reweigh the evidence on appeal, something that this Court is not entitled to do. The State argues that the jury heard the evidence and determined that Defendant touched the victim on the breast and private area beneath her underwear. Additionally, the State counters that it is not required to prove that Defendant actually became aroused, only that the touching was reasonably construed as being for the purpose of sexual arousal or gratification.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Reid*, 91 S.W.3d at 277. Questions concerning the

"credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Defendant was charged with two counts of aggravated sexual battery. In order to establish the offense of aggravated sexual battery, the State had to prove that there was unlawful sexual contact between Defendant and the victim, who was less than 13 years of age. T.C.A. § 39-13-504(a)(4). "Sexual contact" means the intentional touching of anyone's intimate parts—or the clothing covering those parts—if the touching can be "reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6). The "primary genital area" and "breast" are both considered an "intimate part." T.C.A. § 39-13-501(2). Moreover, "jurors may use their common knowledge and experience in making reasonable inferences from evidence." *State v. Meeks*, 876 S.W.2d 121, 131 (Tenn. Crim. App. 1993) (citing 23A C.J.S. Criminal Law § 1380).

The proof at trial, in a light most favorable to the State, indicated that the victim was under age 13 when her father, Defendant, touched the victim on her breast area underneath her shirt and that his hand remained there for a short period. Next, Defendant touched the victim's private part inside her underwear. While the victim's testimony indicated that Defendant's face was in his pillow, the jury heard the evidence and must have determined that the touching was for the purpose of sexual arousal or gratification. In our view, the evidence was sufficient to support the convictions. We cannot reweigh the evidence on appeal. Defendant is not entitled to relief on this issue.

*Sentencing*

Next, Defendant claims that his sentence is excessive. Specifically, he alleges that the weight given by the trial court to the enhancement and mitigating factors "did not comply" with the purposes and principles of the Sentencing Act. Defendant points to his trauma and mental illness and the fact that he is reportedly well-liked and loyal. The State disagrees.

*Length of Sentence*

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant made in the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* T.C.A. § 40-35-210(b) (2021); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103(5) (2021).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. T.C.A. § 40-35-210(e) (2021); *Bise*, 380 S.W.3d at 706. However, "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]." *Bise*, 380 S.W.3d at 705-06. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. T.C.A. § 40-35-401 (2021), Sentencing Comm'n Cmts.

Because the trial court imposed within-range sentences and placed its reasoning on the record, we will review its decisions under an abuse of discretion standard with a presumption of reasonableness. *Bise*, 380 S.W.3d at 707.

Although the trial court should also consider enhancement and mitigating factors, such factors are advisory only. *See* T.C.A. § 40-35-114 (2021); *see also Bise*, 380 S.W.3d at 698 n. 33, 704; *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is

'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Id.* at 346.

As detailed in the factual background section, the trial court noted that Defendant was convicted of two Class B felonies as a Range I offender, subject to a sentence of 8 to 12 years at 100%. The trial court applied enhancement factors (1) and (8), giving them both great weight. The trial court declined to apply several other enhancement factors. The trial court found mitigating factors (1) and (13) applied but gave them little or no weight before sentencing Defendant to 12 years on each count.

Defendant challenges the weight the trial court placed on enhancement factors and the lack of weight the trial court placed on mitigating factors to justify his argument that the maximum sentence was not appropriate where the crime was not of "such huge dimensions that justice would demand" such a sentence. Here, the trial court considered the evidence and the statutorily mandated considerations and referenced the principles and purposes of sentencing. We conclude that the sentences imposed were within the statutory range and consistent with the purposes and principles of sentencing, and we accordingly conclude there was no abuse of discretion. Defendant is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE